**Debbie BONIDY, Plaintiff–Appellant and Cross–Appellee,**

**v.**

**VAIL VALLEY CENTER FOR AESTHETIC DENTISTRY, P.C. and James J. Harding, D.D.S., Defendants–Appellees and Cross–Appellants.**

No. 09CA0602.

Colorado Court of Appeals, Div. I.

March 18, 2010.

Leavenworth & Karp, P.C., Sander N. Karp, Anna S. Itenberg, Glenwood Springs, CO, for Plaintiff–Appellant and Cross–Appellee.

Stevens, Littman, Biddison, Tharp & Weinberg, LLC, Mark E. Biddison, Boulder, CO, for Defendants–Appellees and Cross–Appellants.

Opinion by Judge TAUBMAN.

Plaintiff, Debbie Bonidy, appeals the aspects of the trial court's judgment calculating her back pay damages and denying her claim for exemplary damages. Defendants, Dr. James J. Harding and Vail Valley Center for Aesthetic Dentistry, P.C. (collectively Dr. Harding), cross-appeal the trial court's denial of a directed verdict and its conclusion that Bonidy was wrongfully terminated in violation of public policy. We affirm in part, reverse in part, and remand for further findings consistent with this opinion.

## I. Background

This is the second appeal from a dispute involving the termination of Bonidy from Dr. Harding's dental practice. The first appeal was resolved in *Bonidy v. Vail Valley Center*

*for Aesthetic Dentistry, P.C.,* 186 P.3d 80 (Colo.App.2008) *(Bonidy I).* Another division of this court concluded in *Bonidy I* that working conditions violating Colorado Wage Order No. 22 may constitute a violation of public policy and remanded for reinstatement of Bonidy's claim for wrongful termination in violation of public policy and a new trial.

Bonidy worked for Dr. Harding as a dental assistant from October 1998 until she was terminated in August 2004. A year after Bonidy was hired, Dr. Harding implemented an office policy preventing employees from taking meal or rest breaks unless a patient cancelled an appointment. On July 28, 2004, Dr. Harding revised the policy to prevent employees from leaving the office, except to use the restroom, even if a patient cancelled an appointment.

Bonidy's husband immediately contacted an attorney who advised him that the work schedule violated Colorado wage laws. Bonidy's husband then e-mailed Dr. Harding advising him that he believed Bonidy's schedule violated Colorado Wage Law No. 22, sections 7 and 8, promulgated by the Colorado Department of Labor and Employment. Section 7 stated, "[E]mployees shall be entitled to an uninterrupted and 'duty free' meal period of at least a thirty-minute duration when the scheduled work shift exceeds five hours." Section 8 provided, "Every employer should authorize and permit rest periods, which, insofar as practicable, shall be in the middle of each four (4) hour work period. A compensated ten (10) minute rest period for each four (4) hours or major fractions thereof shall be permitted for all employees."

After returning from vacation on August 10 and reading the email from Bonidy's husband, Dr. Harding fired Bonidy. Bonidy was earning $28 an hour when she was terminated.

Dr. Harding then asked Bonidy to work three additional days, and she agreed. The following day, Dr. Harding discovered that $240 was missing from the office. When Bonidy asked Dr. Harding if he suspected her of the theft, Dr. Harding assured her he did not think she took the money, allowed her to continue working, and permitted her to continue handling money in the office. On Bonidy's last day of employment, August 12, Dr. Harding informed Bonidy that he would pay her for a week of accrued vacation the following week. Instead, Dr. Harding sent Bonidy a letter informing her that, upon further consideration, he did not think a terminated employee was entitled to accrued vacation pay.

Bonidy's counsel sent Dr. Harding a demand letter in October 2008 accusing Dr. Harding of violating Colorado Wage Order No. 22. The day after Dr. Harding received the demand letter, he contacted the police and accused Bonidy of stealing $240 from his office. Dr. Harding did not initially report that he allowed Bonidy to continue working after he fired her or that his office was being remodeled at the time of the theft and multiple people had keys to the office. The trial court found that Dr. Harding's accusation against Bonidy was "retaliatory and vindictive conduct."

Bonidy searched for new employment after her termination, and then decided to start her own business offering temporary dental assisting and office management services to local dentists in November 2004. She began her business full time in April 2005. Bonidy earned $3,000 from her business from the date she started it until July 2006, the date of the first trial. Bonidy sought back pay damages from the date she was terminated until the date of her first trial.

The first trial ended in a directed verdict for Dr. Harding, and Bonidy appealed. As noted, in *Bonidy I,* a division of this court remanded the case for a new trial.

In the second trial, the court held Bonidy had been wrongfully terminated in violation of public policy and awarded Bonidy $21,040 in damages. The court concluded that Bonidy was entitled to lost wages in the amount of $17,920, accrued from the date of her termination in July 2004 until she opened her business in November 2004. The court also awarded Bonidy one week of vacation pay in the amount of $1,120 and reimbursement of a health insurance premium in the amount of $2,000. The court did not offset Bonidy's lost wages damages against her business earnings because it concluded her back pay

period ended when she began the business. The court denied Bonidy's request for exemplary damages and denied Dr. Harding's motion for a directed verdict.

This appeal by Bonidy and cross-appeal by Dr. Harding followed.

## II. Wrongful Termination

We first consider the issues raised by Dr. Harding on cross-appeal because if we were to agree with his contentions, we would not need to address the issues raised in Bonidy's appeal.

Dr. Harding contends the trial court erred in concluding Bonidy established the necessary elements for her claim of wrongful termination in violation of public policy. We disagree.

### A. Standard of Review

■ In a bench trial, "the court shall find the facts specially and state separately its conclusions of law thereon." C.R.C.P. 52. The rule also provides that the trial court's factual findings may only be set aside if clearly erroneous. "The ultimate test as to the propriety of findings is whether they are sufficiently comprehensive to provide a basis for decision and supported by the evidence." *Mowry v. Jackson*, 140 Colo. 197, 202, 343 P.2d 833, 836 (1959) (quoting *Maher v. Hendrickson*, 188 F.2d 700, 702 (7th Cir.1951)).

### B. Sufficiency of Evidence

■ An employment agreement for an indefinite period of time is presumed to establish an employment at will relationship that either party is free to terminate at any time with or without cause. *Slaughter v. John Elway Dodge Southwest/AutoNation*, 107 P.3d 1165, 1167–68 (Colo.App.2005). However, a public policy exception allows at-will employees to bring a claim for wrongful discharge if they allege termination as a result of conduct that is protected or encouraged as a matter of public policy. *Kearl v. Portage Envtl., Inc.*, 205 P.3d 496, 498–99 (Colo.App.2008).

■ The supreme court articulated the elements that constitute a wrongful termination in violation of public policy in *Martin*

*Marietta Corp. v. Lorenz*, 823 P.2d 100 (Colo. 1992). The factors a plaintiff must prove are (1) the employer directed the employee to perform an illegal act as part of the employee's work-related duties or prohibited the employee from performing a public duty or exercising an important job-related right or privilege; (2) the action directed by the employer would violate a specific statute related to public health, safety, or welfare, or would undermine a clearly expressed policy relating to the employee's basic responsibility as a citizen or the employee's right or privilege as a worker; (3) the employee was terminated as the result of refusing to perform the act directed by the employer; and (4) the employer was aware that the employee's refusal to perform the act was based on the employee's reasonable belief that the directed act was unlawful. *Id.* at 109.

Dr. Harding only contends that Bonidy failed to meet her burden of proof with regard to the third and fourth elements of her wrongful termination in violation of public policy claim. First, Dr. Harding asserts that Bonidy did not refuse to work or object to the schedule and thus her claim fails. We disagree.

■ We conclude that when an employee objects to performing an act that satisfies the second element of a claim for wrongful termination of public policy and is immediately fired before having an opportunity to refuse to perform the directed act, the refusal element of the *Lorenz* test is satisfied.

The supreme court has held that a refusal is not limited to a verbal expression of refusal and can consist of inaction. *Rocky Mountain Hosp. & Med. Serv. v. Mariani*, 916 P.2d 519, 528 n. 12 (Colo.1996) (defining "refuse" as "to avoid or shun," "to decline to accept," or "to show or express a positive unwillingness to do or comply with"). In *Hoyt v. Target Stores*, 981 P.2d 188, 192 (Colo.App.1998), a division of this court concluded an employee was not required to file a formal complaint with the employer because "[u]nder such circumstances, a formal complaint to [the employer] about its [disputed] policy would have been a futile gesture." The division also stated, "[W]e are unaware

of any decision by the supreme court or any panel of this court holding that the formal filing of such a complaint by an employee is a prerequisite for a claim of wrongful discharge in violation of public policy." *Id.*

Other jurisdictions have recognized that an employee can meet the refusal requirement of a wrongful termination claim in ways other than actually refusing to perform the employer's directive. In California, the court of appeals upheld a wrongful termination claim where a doctor was discharged after arguing with another doctor over appropriate medical care. *Khajavi v. Feather River Anesthesia Med. Group*, 84 Cal.App.4th 32, 100 Cal. Rptr.2d 627 (2000) (holding that the employee's behavior constituted a sufficient protest of the employer's decision, policy, or practice). California courts have also held that "an employee must be protected against discharge for a good faith complaint about working conditions which he believes to be unsafe." *Cabesuela v. Browning–Ferris Indus., Inc.*, 68 Cal.App.4th 101, 80 Cal.Rptr.2d 60, 64 (1998) (allowing an employee to bring an action for wrongful termination in violation of public policy for protesting extended working hours); *cf. Murcott v. Best W. Int'l, Inc.*, 198 Ariz. 349, 9 P.3d 1088, 1097 (Ct.App. 2000) (holding that an employee's protests to company management were legally sufficient to garner whistle blower protection, rejecting employer's argument that employee must have first refused to carry out employer's directions).

■ Here, when viewing the evidence in the light most favorable to Bonidy, we conclude that the record establishes that Bonidy objected to the work schedules imposed by Dr. Harding, and that any formal complaint by her would have been futile. First, although Dr. Harding correctly points out that Bonidy testified that she never refused to perform under the revised work schedule, other evidence supports the trial court's conclusion that Bonidy objected to the work schedule. At trial, the police officer who received the complaint from Dr. Harding about the missing $240 testified that Dr. Harding had told him that Bonidy had been complaining about not getting breaks, among other things. Further, Dr. Harding testified

about a memo he prepared the evening before he fired Bonidy in which he wrote, referring to Bonidy, "I no longer want to hear anything about the schedule." Although Dr. Harding maintains that this reference was limited to Bonidy's complaints about other aspects of the schedule, such as late hours and vacations, it is subject to different inferences.

In addition, the record supports the trial court's conclusion that Bonidy was fired immediately after Dr. Harding read the e-mail from her husband advising Dr. Harding that his new work schedule violated wage laws. The record supports the trial court's conclusion that Dr. Harding reasonably believed that the e-mail from Bonidy's husband expressed Bonidy's views. This conclusion was all the more reasonable in light of other testimony that Bonidy's husband had acted on Bonidy's behalf in paying for her health insurance, which was to be reimbursed by Dr. Harding.

Under these circumstances, the record clearly supports the trial court's conclusion that Bonidy objected to the work schedules imposed by Dr. Harding and did not have an opportunity to refuse to follow his directive regarding no lunch and rest breaks before her employment was terminated.

Even if we were to conclude that a refusal to comply with an unlawful request is required under *Lorenz,* we conclude that such a requirement is necessarily excused when, as here, an employee is terminated immediately after objecting to an employer's directive, affording the employee no opportunity to refuse. *Cf. Shipper v. Avon Prods., Inc.*, 605 F.Supp. 701, 706 (S.D.N.Y.1985) (an employee at will under New York law may not be fired under Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 *et seq.*, when firing occurs just before vesting of pension benefits).

■ In addition, because Dr. Harding fired Bonidy immediately after reading the e-mail from Bonidy's husband, we conclude that the record supports the trial court's finding concerning the fourth element of her wrongful termination claim that Dr. Harding was aware that Bonidy reasonably believed

that the revised work schedule was unlawful. Thus, we disagree with Dr. Harding's argument that Bonidy failed to establish that element of her wrongful termination in violation of public policy claim.

### III. Motion for Directed Verdict

Dr. Harding also contends the trial court erred in denying his motion for a directed verdict. We disagree.

Because we concluded above that Bonidy sufficiently established her claim for wrongful termination in violation of public policy, we also conclude that the trial court properly denied Dr. Harding's motion for a directed verdict brought on the same basis.

Having rejected the issues raised in Dr. Harding's cross-appeal, we now address the issues Bonidy raises.

### IV. Back Pay Damages

First, Bonidy contends the trial court erred in terminating her back pay damages on the date she started her business, rather than on the date of the first trial. We agree.

■ Dr. Harding contends that the amount of damages Bonidy is entitled to is a matter of fact, and the amount awarded by the trial court may only be disturbed if it is completely unsupported by the record. *See Mahan v. Capitol Hill Internal Medicine, P.C.,* 151 P.3d 685, 689 (Colo.App.2006). Bonidy contends that whether the trial court used the correct formula to calculate damages is a matter of law that we should review de novo. *See Sidman v. Sidman,* — P.3d —, —, 2009 WL 3465724 (Colo.App. No. 08CA2454, Oct. 29, 2009) (appellate courts review de novo whether the trial court applied the correct legal standard in making its findings). While Dr. Harding is correct that the amount of damages is reviewed for record support, we agree with Bonidy that the correct formula for calculating back pay damages is a matter of law, and we review de novo.

#### A. Calculation of Back Pay Damages

■ Back pay is a "make whole" remedy intended to restore the employee to the financial situation that would have existed but for the employer's wrongful conduct. *Davis v. Los Angeles Unified Sch. Dist. Pers. Comm'n,* 152 Cal.App.4th 1122, 62 Cal. Rptr.3d 69, 76 (2007) (award should give the employee what he would have earned with the employer less any net earnings during the back pay period); *Kloss v. Honeywell, Inc.,* 77 Wash.App. 294, 890 P.2d 480, 486 (1995); *cf. Genova v. Longs Peak Emergency Physicians, P.C.,* 72 P.3d 454 (Colo.App. 2003) (economic damages are appropriate to put the wrongfully discharged employee in the same position he would have been in had the employer not breached the employment agreement).

The proper formula for calculating back pay and the events that trigger the termination of the back pay period are matters of first impression in Colorado. Thus, we look to other jurisdictions and authority for guidance.

■ A calculation of back pay should include the employee's base salary amount and pay raises the employee reasonably expected to receive, as well as sick leave, vacation pay, and other fringe benefits, during the back pay period. *EEOC v. Financial Assurance, Inc.,* 624 F.Supp. 686, 694 (W.D.Mo.1985). The terminated employee's earnings during the back pay period should then be subtracted from the amount that would have been earned had the employee not been terminated. Andrew J. Ruzicho et al., *Employment Practices* § 72:31 (West 2010); *see also* Kenneth W. Biedzynski et al., Am.Jur.2d *Job Discrimination* § 2607 (2009). Amounts that the employee failed to earn by not properly mitigating damages should reduce the award. *Fair v. Red Lion Inn,* 943 P.2d 431, 437 (Colo.1997).

■ Based on the above authorities, we adopt the general formula for calculating back pay damages used in other jurisdictions: the amount the employee reasonably could have expected to earn absent the wrongful termination, reduced by either (a) the employee's actual earnings in an effort to mitigate damages or (b) the amount the employee failed to earn by not properly mitigating his or her damages.

### B. Mitigation of Damages

As noted, wrongfully terminated employees have an affirmative duty to use all reasonable efforts to mitigate damages. *See Fair,* 943 P.2d at 437 (requiring a wrongfully terminated employee to mitigate damages); *see also In re Lilly,* 173 Vt. 591, 795 A.2d 1163, 1168 (2002) (involving a wrongful termination in violation of a collective bargaining agreement). The issue of what constitutes a reasonable effort to mitigate damages must be determined by the trier of fact. *Fair,* 943 P.2d at 437.

Other jurisdictions have addressed a wrongfully terminated employee's decision to begin a business in the context of whether the decision was a reasonable attempt to mitigate damages. When a wrongfully terminated employee becomes self-employed, the aggregate economic gain found by the trier of fact constitutes the offset against the employee's back pay damages award. *Raya & Haig Hair Salon v. Pa. Human Relations Comm'n,* 915 A.2d 728, 736 (Pa.Commw.Ct.2007). It is the defendant's duty to prove the employee did not use reasonable diligence in seeking comparable alternative employment when requesting the court not award back pay for any period. *Huegel v. Tisch,* 683 F.Supp. 123, 125 (E.D.Pa.1988). An employee's decision to become self-employed does not, as a matter of law, indicate a lack of reasonable diligence by the employee to mitigate damages. *Serricchio v. Wachovia Securities, LLC,* 606 F.Supp.2d 256, 264 (D.Conn.2009).

### C. Determining Back Pay Period

Bonidy contends the trial court erred in terminating the back pay period on the date she became self-employed. We agree, because absent a finding that Bonidy failed to properly mitigate her damages, the trial court erred in concluding that she was no longer entitled to back pay after that date.

The back pay period generally begins on the date of wrongful termination because that is when the economic loss begins. *Filter Specialists, Inc. v. Brooks,* 906 N.E.2d 835, 850 (Ind.2009) (back pay damages begin to accrue on the date of dis-

charge); *Sims v. Mme. Paulette Dry Cleaners,* 638 F.Supp. 224, 230 (S.D.N.Y.1986) (Title VII plaintiff is entitled to back pay from the date of discharge).

Whether the back pay period should terminate when the wrongfully terminated employee becomes self-employed is a matter of first impression in Colorado. Thus, we look to other jurisdictions for guidance. Other courts have found many events sufficient to trigger the termination of an employee's back pay period, including (1) an unconditional offer of reinstatement, *NLRB v. Pepsi Cola Bottling Co.,* 258 F.3d 305, 309 (4th Cir.2001); (2) an employee's failure to take reasonable steps to find comparable employment or rejection of an offer of comparable employment, *Standard Materials, Inc. v. NLRB,* 862 F.2d 1188, 1193 (5th Cir.1989) (terminating back pay period on date employee unreasonably refused an offer of employment); *Cloud v. Casey,* 76 Cal.App.4th 895, 90 Cal.Rptr.2d 757, 764 (1999) (back pay period may terminate when the plaintiff voluntarily removes herself from the job market or rejects the employer's offer of reinstatement); *cf. Smith v. World Ins. Co.,* 38 F.3d 1456, 1464 (8th Cir.1994) (a reasonable rejection of an offer of reinstatement does not terminate the accrual of back pay); (3) an employee's voluntary termination of employment, *Rosenthal v. Sonnenschein Nath & Rosenthal, LLP,* 985 A.2d 443, 452 (D.C. 2009) ("voluntary termination ... represents a choice to incur a loss of earnings in violation of the employee's duty to make reasonable efforts to mitigate damages" (quoting *Wis. Ave. Nursing Home v. D.C. Comm'n on Human Rights,* 527 A.2d 282 (D.C.1987)) ); (4) the date trial begins, *Williams v. Pharmacia Opthalmics, Inc.,* 926 F.Supp. 791 (N.D.Ind.1996) (awarding back pay damages from date of termination to date of trial in Title VII claim); and (5) the date of judgment, *Ford v. Rigidply Rafters, Inc.,* 984 F.Supp. 386, 389 (D.Md.1997) ("the award of back pay should be the difference between what the employee would have earned had the wrongful conduct not occurred from the period of termination to judgment, and the actual earnings during that period"); *Howard v. Ward County,* 418 F.Supp. 494, 505 (D.N.D.1976) (Title VII back pay period end-

ed on date of judgment); *Filter Specialists,* 906 N.E.2d at 850 (employment discrimination case determining the back pay period runs from the date of discharge to the date of the decision).

In *NLRB v. F.E. Hazard, Ltd.,* 959 F.2d 407, 408 (2d Cir.1992), a federal court of appeals refused to enforce a back pay order in favor of a wrongfully terminated employee engaged in self-employment where the employee rejected multiple offers of employment and there were no findings to support the conclusion that the employee's continued self-employment was reasonable in light of bona fide offers of employment. *Hazard* is distinguishable because here, the trial court found that Bonidy's self-employment decision was reasonable after she was unable to find comparable employment.

Dr. Harding did not cite, and we could not locate, any authority to support the trial court's conclusion that a wrongfully terminated employee's decision to start her own business is an independent business decision that automatically terminates the back pay period absent a finding that the employee failed to properly mitigate damages. Because the trial court found that Bonidy's decision to begin her own business was reasonable under the circumstances and that Bonidy fulfilled her duty to mitigate damages, we conclude that the trial court's determination that Bonidy's back pay period terminated on the date she began her own business was in error. The trial court did not find that Bonidy voluntarily removed herself from the employment market, unreasonably rejected offers of comparable employment, or failed to make reasonable efforts to mitigate her damages. Thus, we conclude that the trial court's termination of the back pay period on the date Bonidy started her own business was inconsistent with the trial court's finding that Bonidy's decision to start a business was a proper mitigation of her damages.

Accordingly, we remand for a calculation of back pay measured by the amount of Bonidy's lost wages from the date of her termination to the date of the first trial, less the $3,000 she earned from her good faith effort to start a business. Because it is not at issue here, we need not determine whether the end

date for a back pay award is the date of the first trial, the date of judgment, or some other date. Although Bonidy requested that we award a specified amount of back pay, we believe it is more appropriate for the trial court on remand to make this factual determination.

## V. Exemplary Damages

Bonidy contends the trial court erred in concluding she failed to meet her burden of proof for exemplary damages after the court found Dr. Harding engaged in retaliatory and vindictive conduct. We agree that the trial court's findings may be inconsistent, and we therefore remand for further findings.

We review de novo whether evidence is sufficient to justify exemplary damages, *Blood v. Qwest Servs. Corp.,* 224 P.3d 301, 314 (Colo.App.2009) (*cert. granted on other grounds* Feb. 22, 2010), but the trier of fact has discretion to award exemplary damages. *W. Fire Truck, Inc. v. Emergency One, Inc.,* 134 P.3d 570, 578 (Colo.App.2006). We may not overturn a trial court's denial of exemplary damages when it is consistent with its findings of fact. *Sanders v. Knapp,* 674 P.2d 385, 388 (Colo.App.1983).

The purpose of exemplary damage is to punish the defendant and deter others from similar conduct in the future, not to compensate an injured plaintiff. *Leidholt v. District Court,* 619 P.2d 768, 770 (Colo. 1980). Exemplary damages are available in Colorado only by statute. *Stamp v. Vail Corp.,* 172 P.3d 437, 447 n. 12 (Colo.2007). Section 13–21–102(1)(a), C.R.S.2009, allows exemplary damages to be awarded in civil actions accompanied by circumstances of "fraud, malice, or willful and wanton conduct." A Colorado bankruptcy court held that a judge may find fraud, malice, or wanton and reckless conduct and still decline to award exemplary damages because exemplary damages are discretionary. *In re Rizo,* 34 B.R. 886, 888 (Bankr.D.Colo.1983).

Further, exemplary damages must be established by proof beyond a reasonable doubt. § 13–25–127(2), C.R.S.2009; *see Coors v. Sec. Life Ins. Co.,* 112 P.3d 59, 67 (Colo. 2005).

Bonidy contends the trial court's denial of exemplary damages is inconsistent with its findings of fact because it found Dr. Harding's allegations of theft constituted "retaliatory and vindictive conduct" and she contends "vindictive" is synonymous with "willful and wanton" or "malicious." We agree that the trial court's findings are inconsistent and that Bonidy may be entitled to an award of exemplary damages.

The statute governing exemplary damages defines "willful and wanton conduct" as "conduct purposefully committed which the actor must have realized as dangerous, done heedlessly and recklessly, without regard to consequences, or of the rights and safety of others, particularly the plaintiff." § 13–21–102(1)(b), C.R.S.2009. Because the statute does not define the term "malice," we look to the dictionary definition for guidance. *People v. Daniels*, —— P.3d ——, ——, 2009 WL 4680250 (Colo.App. No. 08CA2586, Dec. 10, 2009) ("When a statute does not define its terms but the words used are terms of common usage, we may refer to dictionary definitions to determine the plain and ordinary meanings of these words."). *Webster's Dictionary* defines "malice" as "an intention or desire to harm another [usually] seriously through doing something unlawful or otherwise unjustified" or "revengeful or unfriendly feelings." *Webster's Third New Int'l Dictionary* 1367 (2002). It defines "vindictive" as "an intent to cause unpleasantness, damage, or pain." *Id.* at 2553. This court concluded that malice in the context of exemplary damages may be found from the "reckless and wanton acts of the injuring party such as disclose an utter disregard of consequences, aside from any intentional malice in its odious or malevolent sense." *Cohen v. Fox*, 26 Colo.App. 55, 58, 141 P. 504, 505 (1914). Similarly, the West Virginia Supreme Court held that "exemplary, punitive, or vindictive damages" may be assessed after a finding of "gross fraud, malice, oppression, or wanton, willful, or reckless conduct" because those terms are synonymous. *Peters v. Rivers Edge Mining, Inc.*, 224 W.Va. 160, 680 S.E.2d 791, 821 (2009); *see also Pichler v. UNITE*, 542 F.3d 380, 389 (3d Cir.2008) (noting the well-established common law principle that a jury may award "exemplary, punitive, or vindictive damages" in a tort action).

Accordingly, we conclude that the trial court's finding that Dr. Harding's conduct was vindictive could be inconsistent with its declining to award exemplary damages. Therefore, we remand to the trial court to resolve the apparent inconsistency in its conclusion that Dr. Harding's conduct was vindictive and retaliatory, but did not support an award of exemplary damages. If the trial court concludes on remand that Dr. Harding's conduct was malicious or willful and wanton, the court may award exemplary damages if it finds beyond a reasonable doubt that Bonidy is so entitled. *See* § 13–25–107(2). Alternatively, the trial court may exercise its discretion and decline to award exemplary damages. *See In re Rizo*, 34 B.R. at 888. However, if the court concludes that Dr. Harding's conduct was not malicious or willful and wanton, it must amend its conclusions regarding retaliatory and vindictive conduct accordingly. In any event, the trial court shall make specific findings regarding exemplary damages.

The judgment is reversed as to the calculation of back pay damages and the ruling on exemplary damages, and the case is remanded for further findings consistent with this opinion. In all other respects, the judgment is affirmed.

Judge HAWTHORNE and Judge FURMAN concur.